Mr. Bryant. May it please the court, Gary Bryant and at council table is Matt Gernon, House Attorney with Norfolk Southern. Norfolk Southern filed this suit alleging that Roanoke had violated the Railroad Revitalization and Regulatory Reform Act of 1976, known as the Four-R Act, by discriminating against the railroad and imposing stormwater management charges on ballasted property. Roanoke imposes the charges based on whether or not property is impervious, as many municipalities do. Norfolk Southern alleged in its complaint that its ballasted property is specifically designed to absorb water and to move it away from the tracks, and in fact does so even better than lawns. In other words, it's not impervious, it's just as pervious as lawn. Nonetheless, that's exactly right. Well, we think that the San Juan cellular three-part test governs, that's what the district court applied, that's what we all argued below, and there have been three federal cases that have applied San Juan cellular to stormwater management charges, and they applied them under ordinances that are virtually identical to the ordinance that Roanoke has. They applied it based on the exact same standard, whether it's pervious versus impervious, and they used the funds generated as a result of the charge in pretty much the same way that Roanoke uses the funds. I think so, although there are three factors, we agree, I think everybody agrees that the last factor is the most important factor. When you say purpose, I think what the third factor says is we take, we look at what happens to the money. Is the money used primarily for the purpose of providing benefits to the public at large, or is it used primarily for the purpose of providing benefits to the particular entity that has to pay the fee? I think that's the test. With respect to that, does it matter that it appears that your client has independent obligations under the Clean Water Act as a way to address stormwater runoff, and if you don't do it, then the city has to do it, so why isn't this a service that the city is providing you and therefore more akin to a fee? I think the distinction is this. The Clean Water Act imposes regulatory obligations on municipalities, on industries, imposes it on many, many different entities. We being the railroad, we have stormwater regulations that are imposed on us. The DEQ, the Department of Environmental Quality in Virginia, imposes stormwater regulations on us. We have industrial property that is highly regulated. We bear the full cost of complying with the regulations that are imposed on us. But there was no barrier to your treating this stormwater runoff yourself. You didn't have to utilize the city's treatment services. We don't utilize the city's treatment services. Let me explain. Couldn't you have treated this yourself, but you did not pursue that option? No, we couldn't treat this. Let me explain what's happening here. Let me try to understand what you're asking. Water that's running off from the surface you can't treat. The water just runs into Lick Run. That's a ditch that's been there a hundred years. This is an obligation imposed on the city. It's imposed on the city. But it arises from water that's running on impervious surfaces. And the railroad has impervious surfaces. And they have an obligation to do something with this water. So it goes beyond just you got other obligations out there. There's a direct connection here. We don't think there's a direct connection. And we don't think the city thinks there's a direct connection. You have to understand we've got property that's been there since the 1800s. And it rains. But they're treating your stormwater runoff. They're treating it. I want to come back to the question Judge Diaz asked because it was very much on my mind. Why is this anything more than a particular fee for a service, a municipal service? Judge, the impression that I think you have is that we have this pile of stormwater and we need somebody to feed it. And that's not what happens. Stormwater runs into the rivers and nobody treats it. The stormwater management program is a pollution prevention and flood control program. It involves dams. It involves levees. It involves education programs. All of those are wrapped into a stormwater management program. Norfolk Southern... You had stormwater management options that you didn't pursue and you loaded it on the back of the city and you said, here, you take care of our runoff. And this is troubling to me because what you're trying to do is to reduce the city's dedicated income. And it's going to have... Reducing this income and reducing this dedicated income is going to mean that localities across Virginia are going to have a lot less money to deal with pollution and, in many cases, federal anti-pollution requirements. And there are going to be increased pollutant discharges into the Chesapeake Bay because, as a result of... If we rule this thing a tax, there would be a dramatic reduction in municipal revenue to this dedicated fund, which is dedicated for environmental purposes and is really crucial to the implementation of federal anti-pollution laws. Let me address each of the points that I think you've made. The first point is, and I think that the Chesapeake Bay Foundation made this argument, if you conclude that this is a tax, then the sky will fall. Well, that's not true. All we're necessarily... Look, you can fix this problem by simply imposing the same stormwater management charge on surfaces that are similar to our surfaces. We would have a tax as long as they didn't discriminate against us. You could fix this problem by imposing that stormwater management charges on property that's like our ballasted property. And under those circumstances, it would mean that you would be imposing the charges on vegetated areas. All areas have some runoff if you have enough of a storm event, including our ballasted property. Let me ask you a follow-up to the question I asked earlier. You would concede, though, that your client is differently situated than a homeowner in the city of Roanoke, don't you? I mean, the homeowner doesn't have any independent obligation under the Clean Water Act to comply with the permitting requirements, the environmental control requirements, right? We would concede that vis-a-vis the Clean Water Act requirements imposed on us. But with regard to stormwater runoff, we are precisely situated like the typical homeowner, because the Clean Water Act imposes no regulations on stormwater runoff except from the industrial problem. Well, getting back to Judge Wilkins' questions, did you have an option to deal with the stormwater runoff yourself? No, Judge. The obligations imposed on us are to deal with the stormwater runoff that's in our industrial areas, and we do exactly that. There are no Clean Water Act obligations to deal with stormwater runoff that simply goes over the ballasted rail yards into Lick Run, where it's gone for a hundred years. Okay, well, no obligations, but could you have dealt with it in your own way? I don't think we could have. I mean, what's happening here is not that the city is capturing our water and treating it. That's not happening at all. Our water simply runs into navigable waters, the Roanoke River, Lick Run, et cetera. They're not capturing and treating anything. All they're doing is implementing a program designed to address water pollution and flood control throughout the city. I thought there was a provision there that you could get some credits for doing things positive in that direction, and in fact, you've done some of that. That's true. There are some credit provisions. You can't do 100% of it, is what you asked the judge to do. We can do everything they ask us to do, but under the stormwater... I said last time, can you do enough to get credits that you don't have? No. No, they have a bottom limit to it. I think it's 50%. I believe it was down to 50%. There's been three federal cases deciding this, and they decided... Those three federal cases looked at facts and circumstances exactly identical to this. Two federal cases, DeKalb County, which is a court of federal claims case, and the very same facts, the very same circumstances, and said, yeah, these are attacks. The reason they are attacks is because the primary purpose of the money is not to provide a benefit to runoff. Norfolk Southern thinks of itself as a good corporate citizen, but they don't care whether this water is clean or dirty. As a corporate citizen, it cares that the water around Roanoke is clean and the streets don't flood. That's what the stormwater management program does. DeKalb County reached that conclusion. McLeod reached that conclusion. There's a broader point that's made here in terms of the principles underlying the TIA and the Tax Injunction Act, and that is we're not to sit around and disrupt the collection of revenue. Now, this is not disruption in the same sense that the TIA talks about, and that is we're not adjoining anybody from collecting anything. But on the other hand, there's a general principle in that federal statute and also in our federal system that we shouldn't be creating disruptions and dislocations in the revenue collection system, and that is what we would be doing here, and that we should allow the revenue collection system to the degree that we're able to proceed in an uninterrupted fashion. It gets back to the old maxim in judging, do no harm, and this may be one of these do no harm cases. Just don't avoid jumping into the middle of the fracas and disrupting a stream of revenue that the city has, it seems to me, reasonably come to rely upon. There's no doubt about that, Judge. They certainly have come to rely upon this. So then why should we upend it under principles of the Any Injunction Act and not disrupting revenue streams of the states in accordance with the principles of federalism? Number one, this is a 4R Act claim. We have a federal right not to be discriminated against. Number two... If it's a tax. If it's a tax, that's right. That's the whole thing. Well, number two, if it's a tax, let's say this court rules that it's a tax, does that mean that they necessarily lose money? No, it simply means they can't discriminate against the railroad, which means you have to treat us like everybody else, either by imposing the tax on everybody else or not imposing it on us. If they impose it on everybody else, they get our money still, and they get everybody else's money too. Well, Judge Conrad, you know, it's the old question of what talks like a duck and quacks like a duck, and Judge Conrad thought that this sort of quacks like a fee, and it seems to me that he had some pretty good reasons for that, that it was part and parcel of a regulatory program as opposed to a general exaction, and that would be one of the characteristics of a fee, and that it went into a dedicated fund rather than the general operating fund, and that was another characteristic of the fee, and that, I mean, I can't see that when he balanced all of the different factors, I can't see that Judge Conrad went far wrong. He just said, look, when I look at this thing, it seems to me not just a general across-the-board levy on the citizenry and everything, it seems like something that's connected with a particular service, and it just bears the earmarks of a fee. I mean, I have the same hunch when I look at it and just say, well, what does this appear to me, and just instinctively it seems to me that this looks like a fee to me. Yeah, well, if you apply the three prongs of San Juan Cellular, it has elected officials who assess it, it's elected officials who decide what it is. Yeah, I know, but it's appointed officials that implement it because they decide what are the impermeable surfaces. Yeah, and that's true of McLeod, and that was true of DeKalb County where the federal judges in DeKalb County went through a detailed analysis of the exact same thing, and the second figure is that it is a large and diverse group of entities that get charged with it, every developed property in the county except for, unless it's 250 or less square feet, and lastly, what do you do with the money? Does the money primarily be used to benefit RONO, I mean, the railroad, or primarily to benefit the public generally? There's always some benefit to the railroad because they're part of the public generally, but the money is used for broad pollution prevention and flooding. That is not to the railroad's benefit primarily, but to the public's benefit. You've got some rebuttal time, so we look forward to hearing from you then. And Ms. Mundy, we'd be happy to hear from you. Thank you, Your Honor. Good morning. May it please the Court. I'm Monica Mundy, and together with Dan Callahan, who is the attorney for the City of Roanoke, and Scott Stevenson, we represent the City of Roanoke. I will be speaking first, and then I will turn over the podium to John Mueller, who is counsel for the Chesapeake Bay Foundation. Your Honor, it does quack like a fee, and the applicable law, Your Honor, Judge Winn, is that when a charge is a fee and not a tax, when it is tied to a regulatory purpose and does not raise general revenue for a municipality or a locality. Here, that's exactly what the charge does. It is regulatory in purpose, and it is used and dedicated solely for the purposes that are required under the city's MS-4 permit, which are dictated by the Clean Water Act standards. So the district court did not err in finding that this was a fee and not a tax. There are five main reasons why this is a fee and not a tax. First, it is tied to a regulatory purpose and a regulatory scheme. Your Honor, both. And I think that really the way that this can be viewed is that San Juan said it's really viewed on a spectrum. You know, we have the quintessential tax and the quintessential fee, but most of these fall somewhere in the blurry middle. This court said it is very blurry. So we're drawing from both lines of cases, and we think under both lines of cases it's satisfied. So my five factors are going to address the factors from the four R cases, which principally focus on is it regulatory in purpose and does it provide for the general revenue. Well, if it's dedicated for just the regulatory purposes and it is regulatory in nature, that's the four R cases. But under the TIA cases, the dictated by San Juan, we believe it also satisfies that test as well. So the five areas that. Five areas, different cases, but doesn't it really come down to purpose? It does, Your Honor. It does. And here, the first point is that this is largely a regulatory purpose. And in Collins, this court noted that the hallmark of a classic fee is if it is tied directly or indirectly to a regulatory purpose. And even in San Juan, the court said it's directly part of a regulatory purpose if it's discouraging certain types of conduct or if it's used to defray the cost of the regulation. Here we've got both. The city has a credit system, which is part of this, and Your Honor also mentioned this earlier, that you can get these credits if you take certain activities on your property to reduce the amount of the runoff, if you reduce the amount of your impervious surfaces, or if you engage in good practices on your property to manage your stormwater, either by building detention ponds or other stormwater activities, then you're going to get a credit. It's the hallmark of a type of a regulatory scheme. If you take certain conduct, your rate will go down. But also, it is absolutely indirectly tied because we're defraying the cost of regulation that is dictated by the Clean Water Act. Now, the Clean Water Act says, okay, states, we're imposing these obligations on you, and the Commonwealth of Virginia chose to delegate the enforcement of that to the localities, including the city of Roanoke. And that's exactly what we have done. Everybody's going to have to do their little part to make the Clean Water Act a reality. Everybody's going to have to do their part instead of just, you know, shifting responsibility here and there and pointing out and saying that, you know, this is your job or this is your job. Everybody's going to have to do their part if the Clean Water Act is going to, you know, actually mean something. That's correct, Your Honor. And the city of Roanoke bears the full burden of that. The full burden of the responsibility is on the city. So the city has to manage all of this stormwater that is flowing off of these impervious surfaces of the property. And, of course, Norfolk Southern has the largest improved property with lots of impervious surfaces in the entire city. And so we have to – we receive that water, we have to manage that water, and we have to improve that water. And the Clean Water Act, and through our MS-4 permit, we're required to monitor and maintain certain levels of sediment and bacteria and pollutants of concern, the PCBs. So this is a requirement where the responsibility falls on the city. And what the city is trying to do is to manage that appropriately and defray the costs of that regulation. And that's the hallmark of what a fee is. Is it at all significant that the entity in this case also has an independent regulatory obligation under the Clean Water Act? Or does that matter? Your Honor, I think it matters a little bit. But I think the bottom line is that what we're talking about largely in this case, because the railroad has really only challenged the ballasted portions of its property, and those really do not have permits. So, for example, the mainline, that is not really a permitted area. And so the water flows into the system. It's on you. Correct, exactly. So what Norfolk Southern wants is it wants all the benefit of being able to discharge into our system, but without the burdens that we have on that system. And all we're trying to do is to share the burden in a way and put it into a restricted fund, which is really our second point and one of the key points in the 4R Act cases. It goes into a dedicated fund. It is by law, by state law, only able to be used for these specific purposes in furtherance of the Clean Water Act. And, in fact, the city has to provide annual reports to the Commonwealth of Virginia demonstrating what the money was used for. And those reports are audited. The city is audited to ensure that the funds are only used for that. The funds that are derived from the stormwater. It's a strictly dedicated fund. Absolutely, Your Honor, it is. And we do not use this fund to raise any type of general revenue. It is used to support what is a very expensive project and will only get more expensive as time goes on. And I think the recent rains that we experienced this summer are certainly a demonstration of the burdens that are placed on this system and that the city must maintain. Don't remind us of that. It's a new month. We're hoping for a drier month, Your Honor. You're going to have better weather. That's right. Is it correct these fees are not adequate to pay for what actually you have to do to operate this? That is correct, Your Honor. Where do you get the other monies from? That money does come from the general revenue. It has to be supplemented because it's not enough. It's not enough to cover it. Why don't you take it all from the general revenue? I'm sorry, Your Honor? Why don't you take it all from the general revenue? Well, because this is the best way by having a separate utility that is devoted to this particular effort and funding that utility is really the best way in the city's mind to manage this. Let me also talk about – Let me follow up. Yes. That's a separate question. So the other side relies extensively on the Dekalb County case for the opposite proposition of what you're arguing here, and I think the principal argument that they're making is that this is something that inures to the benefit of the general public. Is that at all inconsistent with finding this to be a fee? It is not, Your Honor, and I guess you raise two issues. First of all, about whether there is an incidental public benefit here. I mean, there's no question about it, but that doesn't defeat the fact that this is actually a fee, and I think the court can look at the head money cases, the Union Pacific cases for that particular doctrine. In Union Pacific, the Ninth Circuit was clear that the definition of a fee doesn't exclude a charge that has some incidental public benefit. And in the head money cases, that was the case, the old 1880s case from the United States Supreme Court, where there was a charge placed on the head of every immigrant that came into the port, and it was imposed on the ship owners. And there, the court said, you know what, they're regulating immigration. So there was clearly an incidental benefit to the public. There was a benefit to the immigrants because they were, it was providing for their care and their management. And there was also a benefit, but there was an incidental benefit to the public as a whole. But still, in the head money cases, the court said that was a fee and not a tax. Now, turning to the DeKalb case, which I think is the second point of your question, Your Honor, that case is not faithful to the head money cases, in our view. Because in that case, it was a segregated fund, it was a dedicated fund, and we don't think that the court took into account the regulatory nature of it, as required by the head money cases, or the fact that it was not being used for the general revenue. But in that case, there is a distinction that is significant, and that is that the stormwater fee there applied to all owners of developed property. And the court said, as small as a doghouse and as large as an airport. It had none of the size restrictions here. And why is that a problem? It's a problem. Well, I mean, this is close to 90 percent of the developed parcels in the city, right? True, Your Honor, but the question is whether it's correlated, whether there's a connection and a correlation between the fee and the charge. And there plainly is, because it's impervious surfaces that contribute to the problem. It is the impervious surfaces that create the runoff, and the charge itself is structured and based upon the amount of impervious surface that you have on your property. And that was different in DeKalb County? And that was different, Your Honor. That was what was different about it? It applied to all undeveloped property, and the court in that case said it didn't take into account the contribution that was made by each particular property. Now, turning to the question of, you know, is this a service and what benefit does Norfolk Southern get? Because Norfolk Southern is focused on the benefit. There is a benefit to Norfolk Southern, but again, even if there's an incidental public benefit, it doesn't make it a tax. And there are a number of benefits that Norfolk Southern gets. First of all, it gets to use the city's MS4 system. I believe Norfolk Southern has acknowledged, the briefs acknowledge, particularly on mainline area, their stormwater runoff drains into the city's MS4 system. It drains in, and under the mainline property, for example, there's an entire network of underground storm pipes that take the water off of their property, so they can operate their business, and takes it out into the city's surface waters and into the city's system. So number one, it takes the water off of their property, which is clearly a benefit. Number two, it manages and it improves that water before it is discharged. And of course, that's the city's regulatory obligation there. But it also, the city also cleans and maintains the inlets and the culverts. So, for example, we put in our brief that there was an incident in the city back in 2012, where Norfolk Southern had this entire deposit of coal ash slurry that went into our MS4 system, and it clogged the inlets, and so we had to take care of that. We didn't charge an additional fee for that. That was contained within the fee. That's part of the service that Norfolk Southern gets for the MS4 system and for what the city is providing. And so that's the type of example of the benefit and the service that they receive. Now, Judge Wilkinson, you asked the question about, you know, did Norfolk Southern have any options here. They did have some options. I mean, first of all, they could apply for more credits, and in fact, the city has tried to work extensively with Norfolk Southern, even on appeal, to try to work through that. And we've worked with the airport, another large improved parcel in the city, to try to get them more credits, because, of course, that's part of the regulatory aspect. We want them to be doing more stormwater management on their property. That helps us with our regulatory obligations. But also, Norfolk Southern could apply for its own MS4 permit and try to maintain or try to take over its own stormwater management. It's not elected to do that. What it is elected to do is to continue to have its water run into the city system, and that is a burden on the city. This is a tax that would remove the incentives to apply for the credits. It absolutely would, Your Honor. It would have a very negative effect. Yes, it would. Because the whole idea here is ultimately to reduce the fee by having Norfolk Southern take greater responsibility for stormwater runoff. That's correct, Your Honor. And really what Norfolk Southern is asking here is to be treated differently than everyone else in the city who has more than 250 square feet of impervious surface. That's the oddity, is that the whole point of the 4R Act was to treat them the same, and then they want to be treated differently. That's exactly right, Your Honor. There's this irony that's just lying at the bottom of the cage. That's exactly right. Well, I guess that assumes whether or not you're correct in not distinguishing between the lawn and the ballast properties, and their point is you've made an incorrect determination, and that's why they're pursuing relief under the Act. Well, and, Your Honor, that's not an issue that the court is going to decide today. I understand that. But essentially, and we've cited in our brief, I mean, Norfolk Southern has basically, I mean, there's two parts to the ballast. The ballast, you know, is the top part, and then you've got the sub-ballast. It's the sub-ballast that's the problem. We've given them a credit for the top part, the ballast part. That drains the water off the track, but then there's the sub-ballast, which is this compacted part. Under federal law, the sub-ballast has to be so sturdy, it's so sub-compacted, it's so hard that a train can run over it. A train can't run over a lawn. And what the sub-ballast does is the sub-ballast, the ballast drains it off the track, but then the sub-ballast sheds it horizontally into the drainage ditches. When you have sub-ballast, it's not draining vertically. It's draining horizontally into the drainage ditches, and then where does it go from there? Into the city system. When I saw this, I was thinking about ballast. Maybe the way I grew up, and I'm thinking about all these rocks, nice rocks up there. And it looked to me, that's not in purpose, it's going down. But you're telling me underneath that, which makes sense, the water can't go down because it would probably mess up the tracks there. Exactly, Your Honor. There's something down underneath those that's a sub-ballast is what you call? Correct, Your Honor. That is in purpose? Correct, Your Honor. And we've cited in a footnote, there's a federal court case, the Box case. We've cited it in a footnote, and it gives a great description of how a railroad ballast property works. And it's the ballast on top and the sub-ballast. So the sub-ballast is really what the problem is. But what the city is asking for is to be treated differently than any of the other fee payers. That includes non-profits, churches, the federal government, and the city itself. And under the facts, this is a fee and not a tax, so we would ask this court to affirm. And I will defer the remainder of my time to Mr. Mueller unless there are further questions from the court. Let's hear from Mr. Mueller. Thank you, Your Honor. Good morning, Your Honor. John Mueller for the Chesapeake Bay Foundation. I wanted to address one point that Mr. Bryant made, that the city doesn't treat our water. In fact, that's not the issue. They've already admitted that their water does flow into the city system. So in essence, it is doing exactly as Ms. Munday said. It is treating the water by taking it away from their track. How does this inform our decision on whether this is a fee or a tax? Because the city has to address this water. And so Mr. Bryant says, well, the city doesn't do anything with our water. It doesn't treat it at all. And that is incorrect. In fact, I'll use the example of polychlorinated biphenyls, PCBs, a carcinogen. They're found on the Norfolk Southern property. They're industrial use for transformers. People call them dielectric fluid because they wouldn't catch on fire when you use them in high electric capacity. Used throughout the railroad industry. In fact, PCBs were banned in 1978, but the railroads were given an extension of time to wean themselves off having to use them. If you look at the diagrams of the Norfolk Southern property, you'll see big charts like in Joint Appendix 434 of transformers, tanks that hold dielectric fluid. They know they have PCBs coming off their property. In fact, it's part of their permit. We're having service to underscore the tie between this exaction and the regulatory program because every comment here has gone to the point of environmental protection and how to implement and accomplish the objectives of the Clean Water Act, which is a classic indicia of a fee, which is that it's tied to a particular program. We haven't been talking about parks and recreations or schools or prisons or funds going this way and that way. We've been talking about a laser-like focus on how to implement the Clean Water Act's objectives. Correct. And with respect to the PCBs and why that's related to your point is that when PCBs leave the property, and I ask you to take a look at Joint Appendix 1737, and you'll see where Schaefer's Crossing, another piece of the Norfolk Southern property, 24th Street and Roanoke runs right underneath part of that property. Underneath that overpass is a pipe that goes directly from the Norfolk Southern ballasted yard. It is drained specifically to that. It's not a permitted point source, and it goes straight to Horton's Creek, which is part of the city's MS4 system. The city must test that water from time to time in part of its MS4 system, and if it finds PCB hotspots, it has to vacuum dredge them. That's part of their TMDL action plan. So to say that the city does not address the contamination and pollution that runs off Norfolk Southern property is just simply incorrect. That's what happens. And that's the point of the Clean Water Act. Cities are faced with a tremendous burden now of trying to address stormwater. It is the largest growing type of pollution in the Chesapeake Bay region. Cities throughout the region are trying to figure out, how are we going to claw back all of this hard surface that we've allowed to be built  and is now carrying heavy loads of sediment, which smothers benthic organisms, plants and fish and crabs and things that live on the bottom, and how are we going to stop that stormwater from running off? And the simplest way to deal with that is to control it on site. So that's the beauty of this program that the state has set up and that the cities are now trying to implement, is to encourage through the fee that landowners put what we call best management practices on their property. And that's not just build gigantic storm retention ponds, but plant trees. And in fact, I believe, Judge Wynn, you pointed out that Norfolk Southern understood this principle because they had in fact made a claim for their East End shop's water detention pond to get a credit because they were going to store that water on site and let the sediment settle out into that detention pond before it's discharged into the city system. So that is a classic example of how this is a fee that encourages landowners that have impervious surface to control the stormwater that runs off their site. And it will affect, if this court decides that it is a tax, it will affect more than just the city of Roanoke. That's why the Chesapeake Bay Foundation is in this case because there are other cities, like the city of Alexandria, that has tried to impose a similar fee. The same approach is in effect throughout Virginia. Yes, sir. Yes, sir. And all these cities are trying to figure out how they're going to pay for the charges associated with implementing their municipal separate storm sewer programs, their MS4 programs, that all have limitations for sure on sediment, a lot of them also on nitrogen and phosphorus, which are some of the major pollutants to the Chesapeake Bay. A lot of those cities in the Commonwealth of Virginia flow to the James River to other rivers that flow and tributaries that flow into the Chesapeake, which is dying basically from those pollutants. So it's critical that they implement these programs. Thank you, sir. Thank you, Your Honor. Mr. Bryant, do you have some rebuttal time? A little, Judge. Let me make one thing clear. We're not trying to be treated differently. We're trying to be treated the same. The allegations of the complaint are that our ballasted property is like lawns when it comes to whether it's pervious or impervious. We never got to put on our experts to prove that. We were prepared to do so. We had to decide the predicate issue. For purpose of this motion, I think you've got to assume that our ballasted property is as pervious as lawns. And if we are as pervious as lawns, all we're saying is don't tax us, assuming it's a tax, or you can tax the lawns. And then you have even more money to implement this program. So we're not trying to be treated differently. It's just that their entire argument is based on the assumption that they've won the underlying question, which is, is our ballasted property pervious or impervious? They say, well, it's obviously impervious. And so they're trying to be treated differently than the airport, and they're trying to be treated differently than all these parking lots. We are different than the parking lots. We're the same as lawns. We want to be treated the same as those properties that have pervious surfaces. That's our point. Mrs. Munday said over and over, there's an incidental benefit to the public, an incidental benefit to the public, and we think that that's the primary issue here. You've got to decide whether the stormwater management program administered by the city provides an incidental benefit to the public and a primary benefit to the railroad, or a primary benefit to the railroad and an incidental benefit to the public. That is the third factor of San Juan Cellular. It was used by this court in Valero. It's used by several other federal courts when doing the evaluation under the Tax Injunction Act. The question is, where is the primary benefit? We welcome the court to just look at DeKalb County's detailed analysis where they say the presence of a stormwater management system and the imposition of charges to fund that system create reciprocal benefits and burdens for nearly all owners of developed property within the unincorporated areas of DeKalb County. While each property owner is burdened by payment of the charge and enjoys no special benefit by virtue of the connection of its own property to that system, the property owner does derive a benefit from the fact that the stormwater runoff from the other properties is collected and diverted to the system. That benefit, however, is one that is shared with nearly every other member of the community. In short, flood control is a public benefit, and charges to pay for that benefit are typically viewed as tax. The same is said for pollution prevention. Charges to control pollution prevention help everybody. Now, I've got to say this because the notion that this is just a benefit to the railroad specifically and these charges are tied directly to what we do for the railroad, that's something that the city has developed since this litigation. I'm looking at page 108 of the joint appendix. The city had to deal with people who complained, hey, I don't even have water that runs into your stormwater management system and you're still charging me. And this is what the environmental administrator and the 30B6 exchanged by way of e-mails. I quote, this method, charging impervious surfaces, is not intended to derive a cost associated managing runoff from the impervious area, but merely a vehicle to derive revenue fairly across the community. This is simply the basis for generating the fee and has no association with handling flows created as a result of the impervious area. That's the city talking before this litigation. They go on to say, the stormwater utility fee is exactly that. A fee intended to support the total cost for operating and maintaining that utility, herefore unfunded or free, those costs should rightly be shared by the entire community who benefit from a strong, well-managed stormwater utility. The fee could easily have been a tax. We could have used other means to derive an equitable fee structure or factors beyond total impervious area could have been used to derive the fee. They're saying, this program helps the entire community and there's no association between what we charge you and the water we're handling. It's just a means for coming up with revenue. And then you ask yourself, all the money that we pay into that system, is that money really designed to handle the runoff from us or is it designed to deal with everything associated with stormwater management system? Look at page 4 and 5 of Judge Connolly. That doesn't answer the question. I think Ms. Mundy made the point that whether something is a tax or a fee, they're not just imposed for any purpose. A fee is imposed because ultimately that will have some beneficial impact. You don't go around imposing a fee or a tax with the idea that this is really going to do the public in. All of them have at the end of the road the idea that there's going to be some public benefit. Otherwise, they would never be imposed or never be any exaction at all. We agree with that, Judge. And that can't be a single factor that wraps up the case. I mean, sure, the Clean Water Act has a public benefit. Yes, the organic legislation has a public benefit. Presumably, every attempt by whatever means to implement its directive would have some kind of public benefit. But that doesn't mean we can recharacterize something. I don't disagree with that, Judge. But you look at the Union Pacific and the other cases that deal with the regulation. Those were regulations to railroads where the railroads received the primary benefit. That's the question I think this Court has to decide. Is the primary benefit to the railroad or is the primary benefit to the public general? Thank you. Thank you. I'd like to thank our able courtroom deputy, Lisa Robertson, for her great assistance. And we will adjourn court and come down and greet counsel.
judges: J. Harvie Wilkinson III, James A. Wynn Jr., Albert Diaz